**In re BRAEVIEW MANOR, INC., Debtor.**

**Bankruptcy No. 89–05301.**

United States Bankruptcy Court, N.D. Ohio.

March 8, 1993.

Bill J. Gagliano, Rosenzweig, Schulz & Gillombardo Co., L.P.A., Cleveland, OH, for debtor.

Richard Gurbst, Squire, Sanders and Dempsey, Cleveland, OH, for Warren Wolfson and Euclid Health Ltd. Partnership.

Richard A. Baumgart, Dettelbach, Sicherman & Baumgart, L.P.A., Cleveland, OH, for Unsecured Creditors' Committee.

## MEMORANDUM OF OPINION

DAVID F. SNOW, Bankruptcy Judge.

Braeview Manor, Inc., the Debtor in this chapter 11 case, filed its petition on December 28, 1989. The Debtor operates a 230–bed nursing home at 20611 Euclid Avenue, Euclid, Ohio (the "Premises"). On October 17, 1991, First Federal Savings & Loan of Rochester ("FirstFed") filed its motion requesting relief from stay to evict the Debt-

or from the Premises. Hearings on FirstFed's motion were held in November, 1991, and February, 1992. These hearings were largely devoted to, but did not resolve, ownership of the operating rights to the nursing home. The Debtor claimed ownership of these rights and that its eviction from the Premises would destroy this most valuable asset of the estate. FirstFed claimed that there were no operating rights or at least no operating rights which could be treated separate from the ownership of the Premises. The Court granted FirstFed's motion for relief from stay subject to determination of ownership of the operating rights. If Debtor were deemed the owner, it was to have eight months to market them; if not, it was to vacate the Premises as promptly as possible consistent with the welfare of the residents.

The Court scheduled trial on the ownership of the operating rights for April 15, 1992. Although a hearing was held, the trial did not go forward because the parties advised that the matter had been tentatively settled and that the Debtor would continue to operate the nursing home at the Premises under a long term lease. However, the parties did not agree on the terms of the lease and FirstFed subsequently advised that it would not lease the Premises to the Debtor. Instead, FirstFed decided to sell the Premises to Mr. Warren Wolfson ("Wolfson"). Wolfson is an experienced nursing home operator who owns several Ohio nursing homes.

On October 1, 1992, FirstFed sold the Premises for $3,000,000 to Euclid Health Limited Partnership, which had been organized by Wolfson to take title. (References to "Wolfson" hereafter include Euclid Health Limited Partnership unless the context otherwise requires.) The agreement covering this sale provided that the buyer would assume the risk of "litigation before the bankruptcy court contesting which party has control over the operating rights to the licensed beds within the Facility." (Ex. D–31, p. 6, ¶ 11(a).)

On December 8, 1992, the Court tried the issue of ownership of the operating rights

with Wolfson substituted for FirstFed. Following this trial the parties apparently again explored settlement but without apparent success. On January 27, 1993, Wolfson filed a second motion for relief from stay. At a hearing on that motion on February 11, 1993, Wolfson argued that he was entitled to relief from stay in order to pursue eviction of the Debtor from the Premises under state law. This memorandum addresses both the original FirstFed motion for relief from stay as well as Wolfson's January, 1993, motion.

These motions initiated core proceedings under 28 U.S.C. § 157(b)(2)(A) and (G). This memorandum sets forth the Court's findings of fact and conclusions of law pursuant to Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### Background

The Premises were constructed for use as a nursing home in 1965. In 1973 an entity called Euclid Avenue Associates ("EAA") purchased the Premises. In connection with that purchase EAA undertook to expand the nursing home at the Premises from 90 beds to its present capacity of approximately 230 beds. To finance the necessary construction EAA borrowed approximately $2,800,000 from Chase Manhattan Mortgage and Realty Trust secured by a mortgage on the Premises. Chase assigned this mortgage to FirstFed. Contemporaneously with these transactions EAA leased the premises to P.S. Operations, Inc. ("PS") for 25 years with a 10-year renewal option. This lease was assigned to the mortgagee as further security for the mortgage loan.

In late 1986 PS entered into a purchase agreement with the Debtor for the sale of the property used by it in operating the nursing home at the Premises. Under the terms of that agreement the Debtor agreed to pay PS $1,000,000. The agreement contemplated that PS would surrender its license to operate the nursing home at the Premises and that the Debtor would obtain a license from the State of Ohio to operate the nursing home. This licensing process was delayed until July, 1987, however, because the State required certain renova-

tions to the Premises prior to issuing the necessary license to the Debtor. In order to meet the State's requirements, the Debtor was required to expend more than $750,000 on renovations to the Premises. The nursing home operation was closed for approximately three months while these renovations were made.

These events resulted in the Debtor bringing a lawsuit against PS in state court in which it requested a declaration that it was not obligated to pay PS the $1,000,000 purchase price. In December, 1989, that court held, however, that the Debtor was obligated to PS in the amount of approximately $824,000, the $1,000,000 purchase price less certain setoffs. Debtor filed its chapter 11 petition a few weeks after this judgment was entered.

Apparently these events also led to EAA's default under its mortgage to FirstFed. In 1989, FirstFed commenced a foreclosure action against EAA in state court and in September, 1989, a receiver was appointed. The Debtor was named a defendant in that action because of its status as the tenant of the Premises. On September 13, 1990, the state court entered a decree ordering foreclosure of the mortgage. The decree specifically required that the foreclosure sale of the Premises be made "subject to the rights of Braeview." The legal advertisement for such sale confirmed this requirement and stated that the subject matter of the sale was "building and land only. Equipment and operating license not included." (Ex. D–10.) On February 4, 1991, FirstFed bought the property at foreclosure sale through a subsidiary. For purposes of the foreclosure, the sheriff had appraised the land and building at a value of $3,300,000. (Exs. D–10 and D–9.)

Pursuant to an agreement between the parties reflected in this Court's August 2, 1990, order, the Debtor' monthly rental obligation was set at $7,500 per month. (Ex. D–8.) On June 7, 1991, however, FirstFed moved this Court for an order increasing the Debtor's monthly rent. Thereafter, by agreement of FirstFed and the Debtor the rent was set at $24,000 per month. This arrangement continues to date. So far as

appears these two agreements constitute the only formal rental or lease arrangements that the Debtor has ever been subject to in connection with the Premises. Although the purchase agreement between PS and the Debtor contemplated the Debtor's occupying the Premises, the Debtor never formally assumed the PS lease.

Notwithstanding lack of formal agreement the Debtor's right to continue to occupy the Premises was never put at issue until October 17, 1991, when FirstFed filed its motion for relief from stay, some four years after the Debtor took over operation of the nursing home and almost two years after this case was filed. The reason for this rather remarkable reticence was that FirstFed apparently believed, until at least about the time that its motion for relief from stay was filed, that the Debtor owned the operating rights to the nursing home and could transfer those rights to another location of its choice. This belief reflects the advice of its appraisers given to it in 1991 in connection with the foreclosure:

> The current ownership of the subject involves separate ownership of the real estate and license. The tenant is in possession of the license, and as such, can move the license to a new facility anywhere in Cuyahoga County. Such a move could be profitable considering the losses that have incurred at the present location.... The abandonment of the Braeview facility would leave the landlord in a position of finding an alternative use for the property or acquiring a license to reopen the facility as a nursing home.... The relationship between the tenant (owner of the license) and the landlord is critical. The landlord is at a huge disadvantage in negotiations for the tenant's license; the tenant does not have these disadvantages. Under this duress situation, it is difficult to estimate the costs of obtaining a new license. Given this compromising position, the ownership of the fee simple interest should aggressively pursue the purchase of the license, even if at a substantial

premium. The alternative of having no license is bleak.

(Ex. D–17.)

### Discussion

Wolfson premises his request for relief on several grounds: first, the operating rights to the nursing home are not property; second, even if they are property, the Debtor never acquired and does not own the operating rights; and third, even if the Debtor does own the operating rights and even if they would be destroyed by the Debtor's eviction from the Premises prior to having an opportunity to transfer the rights to another location, Wolfson has an overriding right to obtain possession of his Premises. Although implicit from the beginning of this dispute, this latter contention has remained muted, perhaps because of the forfeiture it entails, and the parties have focused on the existence and ownership of the operating rights. Therefore, it seems appropriate to consider the question of operating rights first. If in fact the Debtor does not own them, then as has been made clear from the outset, Wolfson as owner is entitled to immediate possession of the Premises.

Based on the extensive briefing and testimony at the hearings on this matter, it appears clear that the marketplace accords the right to operate a nursing home in Cuyahoga County, Ohio, a value of between $5,000 and $20,000 per nursing home bed. This value bears no relationship to the $500 annual license fee which the Debtor has paid to renew the actual license, or to the bricks, mortar or furnishing of the physical facility in which the nursing home is operated. It is a value created by the restrictions on nursing home operation under state and federal law. A nursing home can be operated profitably only if it is authorized to receive Medicaid funds. In response to federal and state regulatory concern, the number of beds that may be devoted to nursing home use in a community are limited and regulated by law. In Cuyahoga County this limitation and regulation has resulted in a scarcity of beds which apparently justifies the economic premium described above. The testimony is undisputed that businessmen bargain for and transfer operating rights to nursing homes at these substantial premiums.

■ Wolfson does not argue convincingly that he owns the operating rights to this nursing home. His title to and interest in the Premises derive solely from FirstFed and whatever rights FirstFed acquired at the foreclosure of its mortgage. That mortgage does not purport to describe the operating rights nor is there any argument that these rights constitute real property. Moreover, such rights are not described in any security agreement or financing statement filed against EAA in connection with the mortgage financing. There is no evidence at all in the record of any intent on the part of EAA to grant these rights to the mortgagee or to suggest that EAA ever owned the right to operate the Premises as a nursing home. Wolfson's interest in the Premises cannot on the evidence presented be greater than the title FirstFed acquired through the foreclosure sale. FirstFed could not have acquired the operating rights at a sale limited to "land and buildings only, equipment and operating license not included."

FirstFed's behavior until October, 1991, is persuasive that it did not believe that it obtained the operating rights through the mortgage. Its change of heart does not appear attributable to a newfound belief that it in fact owned the operating rights but rather to the belief that they might be obtainable if the Debtor were dispossessed. As Wolfson made clear at the December 8, 1992, hearing, he would not need to rely on a claim of ownership to the operating rights if the Debtor were evicted. In that event, the Department of Health would be faced with a nursing home housing 190 people. Licensing Wolfson to operate the nursing home at premises owned by him would avoid the dislocation of the residents and would not require licensing additional beds in the county. Wolfson would thus obtain the operating rights not on a claim of title or right but because of the Ohio Department of Health's responsibility to provide the residents continued care in a licensed facility.

Instead, Wolfson attacks the Debtor's title to these operating rights. He argues first that the rights were never transferred from EAA to PS. Wolfson argues that what documentation there is supports the conclusion that EAA and not PS owned these rights. Under a purchase option agreement between EAA and PS, the latter committed on exercise of the option to pay EAA in addition to the stated purchase price for the Premises $7,500 per bed for each bed in excess of 220 beds. Wolfson argues that PS would not have committed to make such payment had it owned the operating rights. Although this argument has some plausibility, it carries little weight in the absence of some evidence that EAA held or even claimed the operating rights. Moreover, the per bed payment is consistent with PS being the owner of the operating rights but agreeing as a part of an expansion of the Premises to share some of the enhanced values with the owner of the Premises.

It appears from the testimony that the ownership of the operating license, although not conclusive, is the best evidence as to the ownership of the operating rights. In this case PS was the licensed operator and there is no evidence that anyone else claimed the operating rights to the nursing home or the commercial premium it carries with it.

The absence of any such claimant is consistent with the evidence that reveals that the $1,000,000 purchase price agreed to between PS and Debtor substantially exceeded the value of the equipment and other tangible properties described in its purchase agreement. It is also consistent with Debtor's willingness to pay $750,000 to make improvements to the Premises. This payment makes sense only on the assumption that it had the right to operate the nursing home subject only to issuance of a valid license.

Debtor's actions have been consistent with a belief that it owns the operating rights. In its schedules in this case filed in 1989 Debtor listed the operating rights as an asset at a value of some $696,000. The fact that Debtor failed to pay PS the $1,000,000 purchase price does not impugn its title to the operating rights. PS was granted damages, not recision; whatever title Debtor obtained was left with it together with the payment obligation to PS.

But it is true that although PS actively participated in the regulatory process to transfer the rights it then held to the Debtor (Exs. D–24 and D–25), PS's agreements with the Debtor did not expressly transfer operating rights to the nursing home. Debtor explains this omission on the ground that allocating payment to these rights, rather than to tangible property, could have reduced Medicaid payments and have had adverse tax consequences. Although this explanation does Debtor no credit, it is entirely plausible, and it is consistent with testimony that, as a practical matter, operating rights are transferred through a combination of a surrender of license by the existing operator and the grant by the State of a new license to its successor.

Finally, there is the fact that the parties treated the Debtor as owner of the operating rights from 1987 until 1991 despite the Debtor's failure to pay the purchase price to PS, its failure to pay rent to EAA and the foreclosure and sale of the Premises pursuant to the mortgage. Therefore, it appears that the operating rights constitute an asset of the estate and are worth substantial money to the estate if they can be sold.

■ Wolfson argues, however, that whether or not the operating rights have value they do not under Ohio law constitute property and therefore could not be transferred from PS to the Debtor even if such transfer were intended. It is true that the license to operate a nursing home issued by the State of Ohio is personal. It reflects certification by the Department of Health not only that the nursing home facility qualifies under applicable law but that the licensee meets certain regulatory standards. Ohio Rev.Code Ann. § 3721.07 (Anderson 1992). This means that the transferee of operating rights must not only be willing to pay enough money to an owner of operating rights to persuade him

to surrender his license, he must also satisfy the State that he is qualified to operate a nursing home. For this reason the operating rights and the license are customarily transferred through the device of the transferor surrendering his license and the transferee thereupon obtaining a new license from the State.

There are no cases directly on point on the transferability of operating rights to a nursing home. Wolfson, or his predecessor FirstFed, cited Ohio Admin.Code § 3701–17–03(E) for the proposition that the license to operate a nursing home issued by the Department of Health is not transferable. But that does not answer the question of whether operating rights are property within the meaning of section 541(a) of the Bankruptcy Code. It is clear that this is a federal question governed by federal bankruptcy law. *Terwilliger's Catering Plus, Inc. v. United States (In re Terwilliger's Catering Plus, Inc.)*, 911 F.2d 1168 (6th Cir.1990). In holding that a liquor license constituted property the court said:

> While several Ohio courts have refused to label the rights granted to the licensee as "property rights," the state nonetheless has chosen to grant the licensee rights tantamount to property rights in all but name. While the nature and extent of the debtor's interest are determined by state law "once that determination is made, federal bankruptcy law dictates as to what extent that interest is property of the estate."

911 F.2d at 1172 (citations omitted). For the reasons noted above, this Court has concluded that the operating rights constitute property of the Debtor's estate in this case.

Wolfson also cites *Floro Nursing Home, Inc. v. Ohio (In re Floro Nursing Home, Inc.)*, 64 B.R. 43 (Bankr.N.D.Ohio 1986), to support its position. In that case a chapter 7 trustee sought to compel turnover of a revoked nursing home license from the Department of Health. The Debtor had originally filed for reorganization in chapter 11. The license under which it operated was in the name of its owner, Sharon Floro. During the chapter 11 proceeding the Depart-

ment had initiated litigation to revoke Sharon Floro's license to operate the nursing home. Subsequent to conversion of the case Sharon Floro surrendered the license to the Department of Health in an effort to resolve the litigation. This surrender was made without the knowledge of the trustee who then initiated a turnover action to recover the value of the license for the benefit of the debtor's estate.

The Court denied turnover. It found that there was no indication on the license or other relevant documents that the debtor had any interest in Sharon Floro's license. Second, it found that the trustee could not employ a turnover procedure to compel the Department to reissue a revoked license. Third, it found that the license had been properly revoked and therefore was valueless. Wolfson appeals to language in the second holding to the effect that "a license does not create property or contractual rights." However, this language was preceded by the following:

> Under the provisions of 11 U.S.C. Section 541(a), any rights, whether they be contractual, equitable, or legal, become property of the estate upon the filing of the petition. *This would include the rights to operate under a valid license.*

64 B.R. at 45 (emphasis added).

In *Floro* the trustee sought to compel the Department of Health to undo the revocation of a license. There were no disputed operating rights. In this case, by contrast, the Debtor's right to its license vis a vis the State is not at issue. That license was renewed by the Department of Health in January, 1993.

Both the litigants and the issues in this case are quite different from those before the *Floro* court. In *Floro* the trustee was in effect requesting the bankruptcy court to order the Department of Health to issue a license to a party it apparently did not view as qualified. This implicated the state's regulatory and police powers in ways absent here. In this case two experienced nursing home operators contest ownership of the operating rights to this nursing home. This Court is not being asked,

nor is it required to interfere with the Department's licensing function.

In summary, it appears that the operating rights to these nursing home beds constitute property of the Debtor's estate within the meaning of section 541(a) of the Bankruptcy Code and the authority of *In re Terwilliger's Catering Plus, Inc., supra.* This holding is entirely consistent with the constraints on issuance of nursing home licenses provided by Ohio law and the responsibilities under such law imposed upon the Department of Health.

Debtor's Occupancy of The Premises

■ It is apparent that if the Debtor is evicted from the Premises the estate will lose the value of the operating rights. At that point the Department of Health would apparently license Wolfson to operate the nursing home at the Premises since both he and the facility appear to qualify for a license. On the other hand, with reasonable time and the question of ownership of the operating rights resolved, it appears that the Debtor could realize on this value by selling the operating rights. From the time this matter was put in issue it was clear that the Debtor's only justification for remaining in the Premises was to realize on this asset. At the February, 1992, hearing I ordered from the bench that the Debtor would have eight months in which to market the operating rights if it were deemed to be the owner. This was intended to provide an equitable balancing of the parties' respective interests while affording the Debtor a reasonable time to realize on its property. The December 8, 1992, trial introduced new information as to the factors bearing on this transfer, which are taken into account below. Otherwise this resolution of the parties' conflicting interests still appears reasonable and necessary.

Wolfson bases his argument that he is entitled to an immediate eviction of the Debtor, notwithstanding the latter's ownership of the operating rights, on section 365(d)(4) of the Bankruptcy Code. This section provides that:

Notwithstanding paragraphs (1) and (2), in a case under any chapter of this title, if the trustee does not assume or reject an unexpired lease of nonresidential real property under which the debtor is the lessee within 60 days after the date of the order for relief, or within such additional time as the court, for cause, within such 60–day period, fixes, then such lease is deemed rejected, and the trustee shall immediately surrender such nonresidential real property to the lessor.

The only consensual rental arrangement in this case arose long after the 60–day period stipulated in this subsection. As noted previously, it appears that the Debtor never assumed the lease between EAA and PS. The status of its occupancy is somewhat ambiguous.

At the filing of the case the Debtor was operating under a state court order authorizing the receiver appointed by it to set rents based in part on the Debtor's finances. Some seven months after the case was filed FirstFed and the receiver sought this Court's approval of this arrangement. It was modified about a year later at FirstFed's request to provide for the present $24,000 monthly rental. FirstFed's decision to agree to the sort of rental arrangements that have prevailed in this case rather than to assert its rights under section 365(d)(4) may have stemmed from the conviction that it should not or could not jeopardize the Debtor's operating rights or from the expectation that it could do a deal with the Debtor. In any event it waived any right it may have had under section 365(d)(4) to evict the Debtor. Wolfson is bound by this waiver.

Moreover, Wolfson has suggested no hardship to him from affording the Debtor a reasonable time in which to market the operating rights apart from his loss of the windfall he would realize if the Debtor's rights were terminated. Wolfson bought the Premises with full knowledge of the Court's prior rulings, including its ruling that the Debtor would be afforded eight months to market the operating rights during which it could retain the Premises by payment of the agreed rental. It is apparent that Wolfson bought the Premises on the speculation that he could obtain the premium accorded nursing home beds in

Cuyahoga County by the purchasing of the land, bricks and mortar owned by FirstFed.

His testimony that the Premises are substantially valueless without the operating rights now held by the Debtor is not credible. He is an experienced businessman as well as an experienced nursing home operator. The notion that he would risk $3,000,-000 on a court decision is not plausible. Moreover his purchase price was less than the $3.3 million accorded the land and buildings comprising the Premises in the sheriff's 1991 foreclosure appraisal. It appears likely that Wolfson bought the Premises with the idea that even if he lost this court battle, he could in due course obtain a nursing home license for the Premises. In any event, he bought with full knowledge that his predecessor had agreed to a $24,-000 per month rental figure while issues involving the operating rights were resolved.

It appears from the testimony that the Premises are being appropriately maintained and that the nursing home is being satisfactorily operated by the Debtor. In fact FirstFed's manager was quite complimentary of the Debtor's operation. The Department of Health has recently renewed the Debtor's permit to operate. In short, there appears to be no risk to Wolfson in allowing the Debtor to continue in possession of the Premises during the time reasonably required for the Debtor to transfer its operating rights.

As the Court noted in the 1991 hearing, those rights cannot be marketed in the context of a dispute as to their existence. The witnesses for the Department of Health testified that an application for transfer of license or rights normally takes five or six months, a period which could be extended if there were objections. It was also indicated that there is an administrative appeals procedure which could further delay the application. Therefore it appears that Wolfson could frustrate or delay the transfer process by pursuing objections with the Department of Health. Subject to any such objection it appears from the testimony that the Department's only concern is with enforcing its limitations on the number of beds licensed in the county and with the licensing standards.

Practically, therefore, it is not clear that the Debtor will have a reasonable opportunity to attempt to realize on the operating rights so long as a buyer or buyers are faced with the prospect of delays through Wolfson's administrative opposition with the Department of Health. Therefore, it appears that this Court's prior grant of eight months to the Debtor should be modified to expand such period as necessary to deal with administrative objections and appeals. The parameters of Debtor's effort to sell these rights is unclear at this point. Therefore, the Court orders the Debtor to file within 30 days a detailed proposal for realizing on the operating rights.

The Court's order in conformity with this opinion is attached.